SOUTHERN INDIANA RAILWAY COMPANY ET AL.
*v.* RAILROAD COMMISSION OF INDIANA.

[No. 21,250.   Filed April 2, 1909.]

1. RAILROAD COMMISSION.—*Fixing of Rates.—Appeal.—Collateral Attack.—Injunction.*—In a suit by the railroad commission to enjoin railroad companies from violating a joint freight rate fixed by such commission, answers that such rate is unjust are bad, where no action was commenced by such companies against the commission within thirty days after the making of the order fixing the rate (§5536 Burns 1908, Acts 1907, p. 454, §6), such answers constituting a collateral attack upon such order of the commission.   p. 116.

2. STATES.—*Duties of.—Delegation of.*—The legislature may delegate its power to regulate public-service corporations to commissions, and may provide the method of questioning the decisions of such commissions.   p. 117.

3. JUDGMENT.—*Collateral Attack.—Drains.—Councils.—Trustees.— Boards of Commissioners.—Railroad Commission.*—The orders and proceedings of drainage commissioners, city councils, boards of trustees, boards of commissioners, the railroad commission, and other like agencies, unless void, cannot be attacked except in the way prescribed by statute.   p. 117.

4. ACTION.—*Remedies.—Statutory.*—Where the statute provides an adequate legal remedy, such remedy must be pursued by those aggrieved.   p. 119.

5. INJUNCTION.— *Void Orders.— Railroad Commission.— General Denial.—Evidence Admissible Under.*—The enforcement of a void order of the railroad commission may be enjoined, and where such commission files its complaint to prevent a violation of its order, the invalidity of such order may be shown under a general denial.   p. 119.

6. PLEADING.—*Answer.—Sustaining Demurrer to Paragraph of. —Facts Provable Under Another.*—Where the facts alleged in an affirmative paragraph of answer are admissible under the general denial, already pleaded, the sustaining of a demurrer to the affirmative paragraph is harmless.   p. 119.

7. RAILROADS.—*Regulation.—Public Service.—Eminent Domain.*— Railroad companies are public-service corporations, and though they are granted the power of eminent domain, the implied agreement on their part is that they will treat all alike, make reasonable charges only, and observe the laws provided for their regulation and conduct.   p. 120.

8. RAILROADS.—*Rates.*—*Regulation.*—The legislature has the power to regulate freight and passenger rates charged by railroad companies, where such rates are not controlled by charter. pp. 120, 127.

9. CONSTITUTIONAL LAW.— *Confiscation.*— *Railroads.*—*Rates.*—The legislature has no power to fix railroad rates so low that it amounts to virtual confiscation of property. pp. 121, 128.

10. CONSTITUTIONAL LAW.—*Railroad Rates.*—*Determination of.*— In determining proper railroad rates the cost of construction and permanent improvements, the value of bonds and stocks, the present as compared with the original cost of construction, the probable earning capacity of the property under the rates so fixed, and the cost of operation, and perhaps other elements, should be considered. p. 122.

11. RAILROAD COMMISSION.—*Acts of.*—The authorized acts of the railroad commission are as valid and conclusive as though done by the legislature. p. 123.

12. CONSTITUTIONAL LAW.— *Due Process.*— *Railroads.*— *Fixing Rates.*—An order of the railroad commission fixing a freight rate, where the railroad companies were given the statutory notice and where they appeared and defended, is not void as without due process of law. p. 126.

13. CONSTITUTIONAL LAW.—*Railroads.*—*Regulation.*—The State has no right to exercise arbitrary power over railroad companies, but may prescribe reasonable regulation thereof, where such companies are not doing their duty. pp. 127, 131.

14. CONSTITUTIONAL LAW.—*Railroads.*—*Rates.*—Under the Constitution, it is unlawful to fix a uniform rate applicable to all of the railroads within the State, since the cost of construction and operation, and the earning capacities of such railroads are different. p. 128.

15. CONSTITUTIONAL LAW.—*Railroads.*—*Rates.*—*Powers of Legislature and Courts.*—The legislature's power over the fixing of railroad rates is exclusive, and the courts can interfere therewith only where the Constitution has been violated. p. 130.

16. RAILROAD COMMISSION.—*Fixing of Rates.*—The railroad commission, in fixing railroad rates, must be guided by the principles of the common law, there being no statutory method prescribed. p. 131.

17. RAILROAD COMMISSION.—*Fixing Rates.*—*Joint.*—An order fixing a joint freight rate is not void because the portions of such rate due to the several companies are not apportioned, the statute (§5533 Burns 1908, Acts 1907, p. 454, §3) providing that if the companies cannot agree upon a division thereof, they may apply to such commission which shall determine the proper proportions. p. 132.

18. RAILROAD COMMISSION. — *Freight Rates.* — *Prepayment of*

Southern Ind. R. Co. *v.* Railroad Com., etc.—172 Ind. 113.

*Charges.*—*Statutes.*—Under §5533 Burns 1908, cl. (m), Acts 1907, p. 454, §3, the initial carrier is not required to advance to the delivering carrier the latter's charges for making delivery, nor does such clause require that the delivering carrier shall make the delivery on time and await the ordinary processes of collection. p. 134.

From Lawrence Circuit Court; *James B. Wilson,* Judge.

Suit by the Railroad Commission of Indiana against the Southern Indiana Railway Company and another. From a decree for plaintiff, defendants appeal. *Affirmed.*

*W. T. Abbott, Carl E. Wood, Frank S. Jones, Gardiner, Tharp & Gardiner, Robert N. Palmer, Robert S. Alcorn* and *Edward Barton,* for appellants.

*Charles E. Thompson* and *Henry P. Pearson,* for appellee.

HADLEY, J.—The railroads of appellants, Southern Indiana Railway Company (hereinafter called the Southern) and the Baltimore & Ohio Southwestern Railway Company (hereinafter called the B. & O.), intersect at Bedford, Indiana, at which place said companies maintain proper interchanging switches. The United States Cement Company, a large consumer of coal, operates a cement factory at Lehman, a switch station on the line of the B. & O., two and one-half miles south of Bedford. The cement company got its coal supply from the Linton fields in Greene county, Indiana. Such coal was transported over the Southern as the initial carrier in car-load lots to its side-tracks at Bedford, from which tracks it was switched in the same cars by the B. & O. to the cement plant at Lehman. The service performed by the B. & O. in the transportation of such coal was known as switching service, and the compensation therefor was audited and paid by the Southern, and not by the cement company.

In August, 1907, the cement company filed with appellee its petition asking for a modification and reduction of the freight charges being made against it for transporting said coal from Linton to Lehman. After due notice to appellants, a hearing was given on the petition, and on Septem-

ber 15, 1907, the commission made a finding to the effect that the charges made for transporting said coal from Linton to Lehman were excessive, and entered an order that appellants should not charge or receive a sum in excess of fifty cents per ton for carrying coal between said points, and also ordered that appellants should adopt, and continue in force, a joint rate of not exceeding fifty cents per ton between said points, to be in force and effect for two years from September 19, 1907. The order did not specify which of the companies should furnish the equipment, nor what part of said fifty-cent rate each carrier should receive. A certified copy of the order was served upon each of the appellants, as required by law, and appellants, failing to bring an action in a circuit court, challenging the validity of said order, and refusing, for more than thirty days after the same became effective, to comply therewith, this suit was instituted by the commission to enjoin appellants from charging, jointly or severally, for the shipment of coal from Linton to Lehman, an aggregate rate in excess of that fixed by appellee's final order.

Separate demurrers to the complaint were overruled. The B. & O. answered in three affirmative paragraphs, and the Southern in one affirmative paragraph, to each of which a demurrer was sustained. Appellants refusing to plead further, a decree was entered, enjoining them, in accordance with the prayer of the complaint, for the term of two years. The points made against the sufficiency of the complaint are that the statute and final order of the railroad commission, upon which the complaint rests, are in violation of both the federal and state Constitutions.

For reasons that will appear, we shall first consider the demurrers to the several answers.

1. The point made by appellee against the answers is to the effect that, as said answers set up a state of facts arising upon the merits of the cement company's complaint, and no action having been brought by appel-

lants in a circuit court to test the validity of the railroad com-
mission's final order, as prescribed by the statute, a presen-
tation of such defenses in this proceeding for an injunction is
not permissible, because a collateral attack upon the final
order of the commission.

It has been found to be impracticable for the General
Assembly on the one hand, and the regularly constituted
courts on the other, to provide for and administer all
2.  the details essential to the speedy and efficient conduct
of public affairs in counties and smaller governmental
agencies.   Hence, it has many times been held by this court
that the legislature has power to confer upon agents au-
thority to do certain things which are legislative, or *quasi*-
judicial, in their nature, and when performed within the
limits of the jurisdiction or power conferred, and in the
manner pointed out by the statute, may be *res judicata* or
conclusive, and hence beyond question by any other juris-
diction, except for fraud, or cause that renders the act ab-
solutely void.

Among the agencies thus created and empowered by the
legislature are boards of county commissioners, drainage
commissioners, city councils, trustees of incorporated
3.  towns, and the like.   The act of drainage commission-
ers in the location and construction of drains cannot
be questioned collaterally.   *Anderson* v. *Baker* (1884), 98
Ind. 587, 590; *Sunier* v. *Miller* (1886), 105 Ind. 393, 395.
City councils and boards of trustees of incorporated towns
are created and endowed to do certain things in carrying
forward the municipal governments, some of which are ad-
ministrative, and others legislative, in their nature; but,
when exercised within the powers conferred, are unquestion-
able in a collateral attack.   *Cason* v. *City of Lebanon* (1899),
153 Ind. 567; *McEneney* v. *Town of Sullivan* (1890), 125
Ind. 407, 410.

In *Cason* v. *City of Lebanon, supra,* it is said:   "The law
is that all questions which are properly triable on appeal, or

by some tribunal authorized to try the same, or created for that purpose, must be so tried, and not by injunctions.''

Boards of county commissioners as governmental agents, have limited, though extensive powers of an administrative and *quasi*-judicial character. All the proceedings of such boards in the establishment of public highways, except as to jurisdiction, are conclusive as against collateral attack. *Gold* v. *Pittsburgh, etc., R. Co.* (1899), 153 Ind. 232; *Helms* v. *Bell* (1900), 155 Ind. 502.

Such boards have the power to hear all claims against the county. They hear, on behalf of the county, in an administrative capacity. The county may investigate and determine the validity of claims to enable it thus to discharge its legal obligations without the intervention of courts. In such cases, if the claimant is dissatisfied with the decision of the board, he may carry his case to the circuit court, by appeal or complaint, within thirty days, and have the questions decided by the board reviewed and determined judicially in a court of law. This is his legal remedy, provided by the legislature, and no other is open to him. In such cases, the undisturbed decision of the board of commissioners is as conclusive against collateral attack as the judgment of the circuit court. *Spurgeon* v. *Rhodes* (1906), 167 Ind. 1; *Board, etc.*, v. *Heaston* (1896), 144 Ind. 583, 55 Am. St. 192; §6019 Burns 1908, Acts 1885, p. 80.

The power conferred upon the railroad commission is analogous to the power of boards of commissioners just noticed. It is authorized to hear complaints, strike down existing rates, and create new ones. The power is in no sense judicial, but administrative or legislative in its nature, and the permission of the statute, permitting the aggrieved party to bring his action in the circuit court within thirty days, is but the legislative scheme to have the decisions of the commission judicially determined, if desired, before their enforcement; and evidently it was the legislative intent that the circuit court, reached in the statutory and regular way,

is the forum where all defenses, arising on the merits, must be presented.

Nothing is better settled than, when the legislature specifically prescribes an adequate legal remedy, that alone is open to the litigant. *Couchman* v. *Prather* (1904), 162

4.    Ind. 250; *State, ex rel.,* v. *Black* (1906), 166 Ind. 138, and cases cited; *State, ex rel.,* v. *Indiana State Board, etc.* (1909), — Ind. —.

Appellants having failed to avail themselves of the opportunity presented to assail the order, and having, without cause, permitted the time for the commencement of proceedings in the circuit court to elapse, the final order of the commission as to them must be held conclusive in a court of equity, except against a cause that renders the order void. *Stone* v. *Fritts* (1907), 169 Ind. 361, 15 L. R. A. (N. S.) 1147. It follows that the demurrers to the answers of appellants, setting up, in a collateral proceeding, defenses arising upon the merits of the cement company's complaint, were properly sustained.

Each of the affirmative answers, however, alleged that the statute, upon which the final order of the commission rested, was void, because in conflict with various specified provisions of the federal and state Constitutions. If the order is void, even though there was a failure to seek relief against

5.    it in the regular way, the party affected is not deprived of the right to defend, when such order is attempted to be enforced in a court of equity. And such a defense may be presented under the general denial, which was pleaded by both appellants. *Cheney* v. *Unroe* (1906), 166 Ind. 550; *Jeffersonville Water Supply Co.* v. *Riter* (1897), 146 Ind. 521, 526. Hence, for this reason, the sus-

6.    taining of the demurrers to the affirmative paragraphs of answer was harmless, even though they were nominally good.

We therefore proceed to consider the constitutional questions arising upon both the complaint and the answers.

It is insisted that the statute in controversy violates the 14th amendment to the federal Constitution, and §§21, 23 of the Bill of Rights (Art. 1), and §22, article 4, of the state Constitution. First, as to the general right of the legislature to regulate the charges of public carriers. To begin with, we shall presume that the statute as amended in 1907 (Acts 1907, p. 454), creating and empowering the Railroad Commission of Indiana, has the sanction of the federal and state Constitutions.

Railroad companies are public-service corporations. The people grant them the right to exist, and confer upon them rights and privileges superior to those enjoyed by 7. private citizens. They are clothed with authority to exercise the right of eminent domain, and under it may seize and appropriate private property without the owner's consent. All the real property of the State is subject to this right. These extraordinary privileges are granted upon an implied agreement that railroad companies will return to the people the substantial benefits that flow from a vastly improved method of transportation, and that while exercising the public franchise they will treat all patrons without discrimination, and make no exactions for service beyond what is necessary to supply a reasonable profit upon the investment. Besides, the business of railroads is so monopolistic in its nature that, in dealing with the public, the parties do not stand upon an equal footing, and without state intervention the patron may be practically compelled to submit to any terms the company may choose to exact.

It is plain that a license to make discriminating or exorbitant rates would subvert the beneficial interests of the public, which not only lie at the foundation of every 8. franchise, but are as truly within the guaranties of the fundamental law as the property rights of the corporation. These and other considerations give rise to the doctrine that there is inherent in every sovereign the power not only to regulate the conduct of its citizens toward each

other, but, when necessary, to the public welfare, or, to con-
serve a public interest, the manner in which a citizen shall
use his own property.   Hence, it is generally and logically
held that, because of the public character of the business car-
ried on by railroads, and the mutual interest the public has
in these operations, such companies, as to their state busi-
ness, unless protected by their charters, are subject to legis-
lative control as to their rates of fare and freight.   *Munn* v.
*Illinois* (1876), 94 U. S. 113-125, 24 L. Ed. 77; *Chicago,
etc., R. Co.* v. *Iowa* (1876), 94 U. S. 155, 24 L. Ed. 94; *Rail-
road Com. Cases* (1886), 116 U. S. 307, 325, 6 Sup. Ct. 334,
29 L. Ed. 636; *Smyth* v. *Ames* (1897), 169 U. S. 466, 522,
18 Sup. Ct. 418, 42 L. Ed. 819; *Chicago, etc., R. Co.* v.
*Wellman* (1892), 143 U. S. 339, 12 Sup. Ct. 400, 36 L. Ed.
176; *Minneapolis, etc., R. Co.* v. *Minnesota* (1902), 186 U. S.
257, 22 Sup. Ct. 900, 46 L. Ed. 1151; *Minneapolis, etc., R.
Co.* v. *State, ex rel.* (1904), 193 U. S. 53, 24 Sup. Ct. 396, 48
L. Ed. 614; *Atlantic Coast Line R. Co.* v. *North Carolina
Corp. Com.* (1906), 206 U. S. 1, 27 Sup. Ct. 585, 51 L. Ed.
933; *Southern R. Co.* v. *Railroad Com., etc.* (1908), 42 Ind.
App. 90; Joyce, Franchises, §381; 8 Cyc., 1066.

In *Munn* v. *Illinois, supra,* it is said: ''Property does
become clothed with a public interest when used in a man-
ner to make it of public consequence, and affect the com-
munity at large.   When, therefore, one devotes his property
to a use in which the public has an interest, he, in effect,
grants to the public an interest in that use, and must sub-
mit to be controlled by the public for the common good, to
the extent of the interest he has thus created.   He may with-
draw his grant by discontinuing the use; but, so long as he
maintains the use, he must submit to the control.''

But the power to regulate has its limitations.   The power
exists only as a means of preserving the equilibrium of rights
between corporations and the people; that is, to in-
9.   tervene, when necessary, to the extent only of secur-
ing, on the one hand, to railroad companies what they

are entitled to receive as a fair return upon the value of the property they employ for the public convenience, and, on the other hand, to see that the people are not subjected to charges for the use of the railroad in excess of what the carrier may reasonably charge under the facts of the particular case. Regulation must stop short of confiscation. The prevailing rule is tersely and clearly stated by Mr. Justice White, in *Atlantic Coast Line R. Co. v. North Carolina Corp. Com., supra:* "As the public power to regulate railways and the private right of ownership of such property coexist and not the one destroy the other, it has been settled that the right of ownership of railway property like other property rights finds protection in constitutional guarantees, and, therefore, wherever the power of regulation is exerted in such arbitrary and unreasonable way as to cause it to be in effect not a regulation but an infringement upon the right of ownership, such an exertion of power is void because repugnant to the due process and equal protection clauses of the 14th amendment." See, also, *Railroad Com. Cases, supra; Chicago, etc., R. Co. v. Minnesota* (1890), 134 U. S. 418, 455, 10 Sup. Ct. 462, 33 L. Ed. 970; *Reagan v. Farmers Loan, etc., Co.* (1894), 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014; *St. Louis, etc., R. Co. v. Gill* (1895), 156 U. S. 649, 15 Sup. Ct. 484, 39 L. Ed. 567; *Chicago, etc., R. Co. v. Chicago* (1897), 166 U. S. 226, 17 Sup. Ct. 581, 41 L. Ed. 979; *Chicago, etc., R. Co. v. Thompkins* (1900), 176 U. S. 167, 20 Sup. Ct. 336, 44 L. Ed. 417; *City of Indianapolis v. Navin* (1898), 151 Ind. 139, and authorities cited.

What shall be regarded as just and fair rates must be ascertained from various considerations. It was said in the case of *Smyth* v. *Ames, supra,* at page 547: "The

10.    original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by

the statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case.'' See *Southern R. Co.* v. *Railroad Com., etc., supra.*

The case quoted from does not limit the inquiry to the elements specified, but expressly states that there may be, and probably are, others that should be considered in reaching the just and equitable line between the parties. *Southern R. Co.* v. *Railroad Com., etc., supra; Willcox* v. *Consolidated Gas Co.* (1909), 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382.

The decisions seem to hold that, as the state legislature possesses the power to regulate the business of railroads, it may delegate that power to a commission, or other administrative body, and what such administrative agent does, within the powers with which it is endowed, is as valid and conclusive as if done by the legislature itself. *Atlantic Coast Line R. Co.* v. *North Carolina Corp. Com., supra,* and cases cited on page 19; *Southern R. Co.* v. *Railroad Com., etc., supra;* Joyce, Franchises, §381.

Guided by these principles, we shall now turn to the statute complained of: Section three (Acts 1907, p. 454, §5533 Burns 1908) provides that "the power and authority is hereby vested in the Railroad Commission of Indiana, and it is hereby made its duty as hereinafter provided to supervise all railroad freight and passenger tariffs, and to adopt all necessary rules and regulations to govern car distribution and delivery, train service and accommodations and demurrage rules and charges and for car service or the transfer and switching of cars from one railroad to another at junction points, or where entering the same city or town, and to supervise charges therefor; * * * to correct abuses and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads, and to enforce the same by proceedings for the enforcement of penalties provided by law through courts of competent juris-

diction.   *   *   *   (d) The commission shall have power, as hereinafter provided, and it shall be its duty from time to time, to alter, change, amend or abolish any classifications or rates established by any railroad company or companies whenever found to be unjust, unreasonable or discriminative, and to make and substitute for said unjust, unreasonable or discriminative rates or classifications, amended, altered or new classifications or rates.'' It is further provided in clause (h) of said section three, that the commission shall hear the petition of any person, firm or corporation, wherein complaint is made against any common carrier of any act or omission. Said commission, having first given said carrier ten days' notice of the time and place of the hearing, shall proceed to hear the complaint, and, after the hearing, to make any modification or alteration in the rules, regulations or rates as may be necessary to prevent injustice or discrimination to the party complaining.

Section four (§5534 Burns 1908) provides: ''Before any rates or charges of railroads or express companies or other carriers or companies, subject to this act, shall be revised or changed under the provisions of this act   *   *   *   said commission shall give the company or companies affected by such proposed order or revision, not less than ten days' written notice of the time and place where such rates or charges or the matters involved in said proposed order shall be considered; and such company shall be entitled to a hearing at the time and place specified in such notice and shall have process to enforce the attendance of its witnesses. All process herein provided for shall be served as in civil cases.'' It is provided by section six of said act (§5536 Burns 1908): ''Any carrier, or other party, dissatisfied with any final order made by the commission, may, within thirty days after the entry thereof, begin an action against the commission in any court of competent jurisdiction in any county in this State into or through which any such carrier operates, to suspend or set aside any such order.

Southern Ind. R. Co. *v.* Railroad Com., etc.—172 Ind. 113.

Any party to any final judgment of any court in this State, in any proceeding by or against such commission, may prosecute an appeal therefrom to the Supreme Court of this State in the manner now provided by law in civil cases, excepting as otherwise provided in this act. In all actions in the courts of this State authorized by this act the rules of evidence shall be the same as in the trial of civil cases, as now provided by law, excepting as otherwise provided in this act."

Appellee's complaint sets forth that a written petition was filed by the United States Cement Company before the commission, complaining of excessive rates on coal charged to the petitioner by the appellants; that ten days' notice was served upon appellants, and each of them; that appellants appeared to said cause and made their defense to the same before said commission. The commission heard evidence, both oral and documentary, and, after being fully advised, made the following order: "The evidence in the above cause having been heard, and being fully advised, the commission finds that the joint rate of seventy-five cents per ton on coal from the Linton district to Lehman via the Southern Indiana railway and the Baltimore & Ohio Southwestern railway is unreasonable and excessive, and the commission finds that the rate for such coal should not exceed fifty cents per ton. It is therefore ordered that the respondents and each of them be and they are now notified and required to cease and desist on or before Thursday, September 19, 1907, from charging, demanding, collecting or receiving for the transportation of coal from the Linton district on the Southern Indiana railway to Lehman on the Baltimore & Ohio Southwestern railway the present rate of seventy-five cents per ton. It is further ordered that said respondents be and are hereby required to establish and put in force on or before September 19, 1907, a rate of not more than fifty cents per ton, and apply such rate to the transportation of coal in carloads from mines in the Linton district on the Southern In-

diana railway to Lehman on the Baltimore & Ohio Southwestern railway, during a period of two years next after said September 19, 1907. It is further ordered that the secretary send, by registered United States mail, a certified copy of this order to the superintendents of each of the respondents.''

It is contended that this order is in violation of the due process of law and equal protection provisions of the 14th amendment to the federal Constitution, and of §§21 and 23 of the Bill of Rights (art. 1) of the Constitution of Indiana, which prohibit the demanding of services without just compensation, and the granting to one citizen, or class of citizens, privileges and immunities not equally belonging to all; and also is in conflict with §22, article 4, of the state Constitution, which forbids the passage of any local or special law for the punishment of crimes and misdemeanors.

Appellants but feebly contend that the element of due process of law is absent from the statute, and the order made in pursuance thereof. It is shown that the ten days' notice required by the statute of the filing of the cement company's petition was served upon the appellants; that both companies appeared and resisted a modification or reduction of rates. Each was entitled to, and had, a hearing. They also had the right and opportunity afforded by the statute to contest the validity or reasonableness of the commission's order in a court of law of general jurisdiction, and to appeal therefrom to the Supreme Court. This so manifestly exhibits due process of law, within the meaning of the Constitution, that we shall not presume to cite authorities.

It is, however, earnestly insisted that the order which purports to regulate and reduce the joint rate of appellants for the carriage of coal from Linton to Lehman, without requiring other carriers to conform to the same rate, is a denial of the equal protection of the law. It is argued that no other railroad company in the State, engaged in the carry-

ing business, is affected by the order, and that the Chicago, Indianapolis & Louisville Railway Company, whose road in a general way, parallels the Southern from the Linton coal fields to Bedford, having about the same mileage, at which latter place the Southern turns over the shipments of coal in controversy to the B. & O. to switch to Lehman, is left free to charge whatever rate from Linton to Bedford it chooses to make, and that this discrimination against appellants is within the constitutional inhibition. Conceding that the situation with respect to the Chicago, Indianapolis & Louisville Railway Company is as stated in argument, and that the latter company is in fact a competitor of the Southern, we are not even then prepared to accept appellants' contention.

It should be borne in mind that we are considering an inherent power of the government to intervene between a citizen and the public to prevent a wrong to the latter.

13. The power is an attribute of sovereignty, but can be exerted only when necessary to preserve or promote some right or interest impressed with a public character. It does not follow that because a railroad company is engaged in public carriage it is subject to arbitrary regulation by the state or its agent. If it renders to all those who patronize the road, or whose interests are affected by it, whatever they are entitled to receive in the way of reasonable charges, service and administration, the state has no authority or power to intermeddle with its affairs. The state moves only against transgressors.

In respect to the limitation or regulation of rates, what is aimed at by the statute, and that is sought through a final order of the railroad commission, is to establish such

8. a tariff of charges as will, from the aggregate of business done, yield to the carrier a reasonable profit on its investment. It is at no time expected that it will build and operate the road at a loss. The granting of the fran-

chise implies a stipulation that the carrier may make such charges as will give it some return on its property.

9.   What that profit shall be—whether ten, six, two, or any other per cent—must be determined from the facts of each particular case, taking into account, as against the cost and earning capacity of the railroad, the value of the service to the shipper, and the amount he can reasonably afford to pay. In short, as the charge approaches oppression to the shipper, it should in the same degree approach the point of minimum profit to the carrier. Such nicety of balance is hardly attainable; but this is the theory of the law, and must be substantially complied with to avoid the condemnation of the Constitution. To allow a carrier, for the use of its road, a rate less than is necessary to save it from actual loss in its operation, is to take the property without just compensation and without due process of law; and to require of shippers a greater charge than is reasonable, under the circumstances, is to treat them in the same way. In either case the act is confiscatory.

It is plain that uniform rates, applicable alike to all the railroads of the State, within the sanction of the Constitution, is a legal fiction. Such a tariff would be im-

14.   practicable. It is perfectly well known that the cost of construction and the earning capacity per mile of all the railroads in the State are not the same. Roads in smooth, densely populated parts of the State, where the volume of business, in both freight and passengers, is large, may be constructed and maintained for a much less sum than similar roads in rough, broken parts of the State, where there is much less population and business; yet the roads in the latter districts are just as much needed by the fewer residents, and the owners just as much entitled to a fair profit on their investment in the property, as the owners of the higher class roads. If the maximum rate should be made high enough to enable the weaker ones to make a profit, however small, the more lucrative properties would be au-

thorized to exact charges of the public that would amount
to a clear violation of both Constitutions; while, if the uni-
form maximum rate should be established so low as to en-
able the most profitable roads to make but a reasonable re-
turn on their cost, the same would utterly destroy the
weaker ones, which would amount to confiscation.

In 1890 the legislature of Kentucky passed an act limit-
ing the tolls that might be charged by the turnpike companies
of the state.   Concerning which, and the question we have
in hand, Mr. Justice Harlan, in *Covington, etc., Road Co.* v.
*Sandford* (1896), 164 U. S. 578, 597, 17 Sup. Ct. 198, 41 L.
Ed. 560, said: "It is further insisted by the company that
the rates prescribed for it by the act of 1890 are much less
than those imposed by the general statutes of Kentucky upon
other turnpike companies of the state; consequently, that
that act denies to it the equal protection of the laws.   The
proposition of the defendant is, that the constitutional pro-
vision referred to requires all turnpike companies in the
state to be placed by the legislature, when exercising its gen-
eral power over the subject of rates to be charged upon
highways of that character, upon substantially the same foot-
ing.   Upon this point the court of appeals of Kentucky said:
'A turnpike road leading into and connected with a populous
city like that of the city of Covington could afford to charge
less toll by reason of the immense travel upon it than turn-
pikes in thinly settled portions of the county or state, and
hence under former constitutions the legislature has seen
proper to regulate the tolls as the turnpike road may hap-
pen to be located.'   The circumstances of each turnpike com-
pany must determine the rates of toll to be properly allowed
for its use.   Justice to the public and to the stockholders
may require, in respect of one road, rates different from
those prescribed for other roads.   Rates on one road may be
reasonable and just to all concerned, while the same rates
would be exorbitant on another road.   The utmost that any

corporation, operating a public highway, can rightfully demand at the hands of the legislature when exerting its general powers is that it receive what, under all the circumstances, is such compensation for the use of its property as will be just both to it and to the public.''

Another principle of law is well settled, viz., that, when a state has the right of regulation, its exercise is an exclusive function of the legislature by itself or properly endowed agent. Whether the mode adopted by that body is wise or unwise is not a matter of judicial cognizance. The courts can interfere only when the legislative method violates some provision of the Constitution. Almost any basis, or classification, in the process of regulation, that rests upon a rational, reasonable and equitable foundation, may be established and enforced.

Touching this same principle, it was said by Mr. Justice Gray, in *Dow* v. *Beidelman* (1888), 125 U. S. 680, 691, 8 Sup. Ct. 1028, 31 L. Ed. 841: ''The legislature, in the exercise of its power of regulating fares and freights, may classify the railroads according to the amount of the business which they have done or appear likely to do. Whether the classification shall be according to the amount of passengers and freight carried, or of gross or net earnings, during the previous year, or according to the simpler and more constant test of the length of the line of the railroad, is a matter within the discretion of the legislature. If the same rule is applied to all railroads of the same class, there is no violation of the constitutional provision securing to all the equal protection of the laws. A similar question was presented and decided in *Chicago, etc., R. Co.* v. *Iowa* [1876], 94 U. S. 155, 24 L. Ed. 94. It was there objected that a statute regulating the rate for the carriage of passengers, by different classes of railroads, according to their gross earnings per mile, was in conflict with article 1, §4, of the constitution of Iowa, which provides that 'all laws of a general nature shall have a uniform operation,' and 'the general assembly shall

not grant to any citizen, or class of citizens, privileges or immunities which upon the same terms shall not equally belong to all citizens.' In answering that objection, the Chief Justice said: 'The statute divides the railroads of the state into classes, according to business, and establishes a maximum of rates for each of the classes. It operates uniformly on each class, and this is all the constitution requires. \* \* \* It is very clear that a uniform rate of charges for all railroad companies in the state might operate unjustly upon some. It was proper, therefore, to provide in some way for an adaptation of the rates to the circumstances of the different roads; and the general assembly, in the exercise of its legislative discretion, has seen fit to do this by a system of classification. Whether this was the best that could have been done is not for us to decide. Our province is only to determine whether it could be done at all, and under any circumstances. If it could, the legislature must decide for itself, subject to no control from us, whether the common good requires that it should be done.' " See, also, *New York, etc., R. Co.* v. *New York* (1897), 165 U. S. 628, 633, 17 Sup. Ct. 418, 41 L. Ed. 853.

The statute in controversy does not provide any specific basis, or classification, of railroads for the guidance of the commission in determining proper tariffs. The commission must, therefore, be directed by the rules and principles of the common law, and exert regulation only against such railroads in the State as may transcend their rights against the public as heretofore defined.

The whole matter comes to this: All railroad companies in the State, great or small, are required to be fair with the people, and exact from shippers and passengers, as tariffs for the use of the railroad, only such amounts as will, from the aggregate net receipts, yield a profit that is just and reasonable, as against the part of the public affected, under the circumstances of the particular case. When the duty is transgressed by any company in the State,

it thereby enters the class that may be regulated, and in this sense the statute is of uniform application, and affords all the equal protection of the laws.

It is argued that the order of the railroad commission is void for uncertainty, in that it operates against both appellants, with no directions as to what either shall do, or 17. refrain from doing, or as to what part of the fifty cent rate each shall receive for its service in transporting coal from Linton to Lehman. This position cannot be maintained. The policy of the law is to give to railroad companies, as common carriers, the fullest freedom, consistent with the character of their business, in the management of their own affairs. They may construct, equip and operate their properties, fix their own time-tables and tariffs, make their own contracts, and in all things claim, with individuals, the equal protection of the laws. The liberty of action of the public carrier has its limitations, on the same principle that applies to the individual.

The statute under consideration is constructed on these lines. With reference to the joint rate of connecting carriers, and as to how they shall be established, the statute (§5533 Burns 1908, Acts 1907, p. 454, §3) provides as follows: ''(b) The said commission shall have power and it shall be its duty, as hereinafter provided, upon the failure of the railroad companies so to do, to fix and establish for all or any connecting lines of railroads in this State reasonable joint rates of freight, transfer and switching charges for the various classes of freight and cars that may pass over two or more lines of railroads. (c) If any two or more connecting railroad companies shall fail to agree upon a fair and just division of the charges arising from the transportation of freights, passengers or cars over their lines, the commission shall, as hereinafter provided, fix the pro rata part of such charges to be received by each of said connecting lines.'' The provision ''hereinafter provided'' is found in clause (m), as follows: ''Every such connecting carrier shall,

upon the order of the commission made upon complaint filed and after a hearing is had, as provided in this act, receive from its connecting lines at junction points, all carload shipments tendered by any such connecting line, and upon payment of reasonable transfer or switching charges therefor, shall transport such car over its tracks and deliver the same to the consignee on his private track connected with such tracks.''

The language of the order is that each of the respondents is now notified and required to desist, on or before Thursday, September 19, 1907, from charging, demanding or receiving for the transportation of coal from the Linton district, on the Southern, to Lehman, on the B. & O., the present rate of seventy-five cents, and are hereby required to establish and put in force, on or before said date, a rate of not more than fifty cents per ton, and apply such rate to the transportation of coal in car-loads from the mines in the Linton district, on the Southern, to Lehman, on the B. & O., during a period of two years after September 19, 1907.

It is obvious that the language of the order affords no ground for the position that it gives no direction as to what either appellant shall do, or refrain from doing. It discloses to appellants that the Linton district is on the line of the Southern, and Lehman, on the line of the B. & O. Each is a common carrier of freight, and it could not be made plainer what each must do and refrain from doing in transporting a car of coal from one place to another.

It is true the order does not indicate what part of the joint rate of fifty cents each shall receive for the service. The commission had no authority in the first instance to divide the aggregate rate between the carriers. This was a matter for appellants to arrange between themselves by agreement. The commission had no power or jurisdiction over the question until after the parties had failed to agree, and the subject was brought before the commission, as provided in clause (m), *supra.* This provision of the statute has not

been complied with, as shown by the record, and, until it is, appellants will have no cause to complain for the want of a rate division order.

Clause (m) is not justly subject to the charge that it requires the initial carrier to advance to the delivering carrier the latter's charges for making the delivery; or, on the other hand, that the latter company shall make the delivery on time, and await the usual processes for collection.

It will be time enough to decide whether a connecting carrier has the right to refuse transfer or switching service until his charges are paid in cash, when such a case arises.

We conclude that the final order of the railroad commission in controversy, and the statute upon which it is based, are not subject to any of the constitutional objections advanced, and that the demurrer to the complaint was properly overruled.

Judgment affirmed.