Donald BLINZINGER, Administrator, Indiana Dept. of Public Welfare, Indiana Dept. of Public Welfare, Appellants (Defendants Below),

v.

AMERICANA HEALTHCARE CORPO-RATION, Elkhart-Americana, Inc., d/b/a Americana Healthcare Center of Elkhart, Capitol Americana, Inc., d/b/a Americana Healthcare Center of Indianapolis-Midtown, Appellees (Plaintiffs Below).

No. 2–1083 A 359.

Court of Appeals of Indiana, Second District.

Aug. 13, 1984.

Linley E. Pearson, Atty. Gen., Gordon E. White, Jr., Deputy Atty. Gen., Indianapolis, for appellants.

David F. McNamar, John H. Sharpe, Steers, Sullivan, McNamar & Rogers, Indianapolis, for appellees.

SULLIVAN, Judge.

This is an appeal from a judicial review proceeding in which Americana Healthcare Centers of Elkhart and Indianapolis-Midtown challenged the decision of the Indiana Department of Public Welfare (DPW) denying their requests for increased Medicaid reimbursement rates. The trial court reversed DPW's determination.

Upon appeal, DPW presents the following issues:

(1) Whether the trial court erred in determining that the DPW decision (rate freeze directive) to take no action upon rate increase requests from healthcare facilities undergoing decertification proceedings was an unpromulgated rule and without effect;

(2) Whether DPW lacked authority, by reason of 42 Code of Federal Regulations 442.12(a) and 441.11(b), to grant rate increases to a healthcare provider undergoing decertification proceedings;

(3) Whether the trial court erred in determining that the rate freeze directive was not within the discretionary power of DPW, pursuant to I.C. 12-1-2-3(f);

(4) Whether the trial court improperly exercised a mandate power in ordering DPW to reconsider Americana's request for rate increases; and

(5) Whether the trial court erred in ordering DPW to reimburse Americana for the cost of preparation and filing of the administrative record of proceedings.

Americana Healthcare Centers (Americana), owns and operates healthcare and nursing home facilities throughout the United States. In October of 1980, two of its facilities in Indiana—Americana Healthcare Center of Elkhart and Americana Healthcare Center of Indianapolis-Midtown—received notice of impending decertification as qualified healthcare providers under the Medicare and Medicaid programs. Upon receipt of notification, the two Americana centers petitioned both

state and federal administrative authorities for a pre-decertification administrative hearing. Both the United States Department of Health and Human Services (HHS), which administers the Medicare Program, and the Indiana Department of Public Welfare (DPW), which administers the Medicaid Program, denied Americana's request for pre-decertification hearings, whereupon Americana sought injunctive relief in the United States District Court for the Southern District of Indiana to enjoin the decertification of the two facilities until such time as hearings were held and an administrative adjudication rendered.

In January, 1981, Judge Dillin of the U.S. District Court for the Southern District of Indiana issued a preliminary injunction prohibiting HHS and DPW from decertifying either of the facilities as Medicare or Medicaid providers and from withholding or delaying the processing of claims or reimbursement of funds from Medicare or Medicaid. Following the issuance of the preliminary injunction, which was later reversed on appeal by the Seventh Circuit Court of Appeals, the Americana facilities submitted to DPW several routine requests for adjustments in the rates for reimbursement paid them through the Medicaid program.[1] DPW regulations permit a Medicaid facility to submit requests twice yearly for adjustments in the Medicaid rates for services rendered to Medicaid patients. 470 I.A.C. 5-4-4. The regulations specify conditions which justify rate increases. One such condition is increased costs to the facility in providing care to Medicaid patients. Each of Americana's requested rate increases were deferred by DPW due to the pending decertification of the two facilities as Medicaid providers.

Americana was informed by Blue Cross-Blue Shield of Indiana, DPW's agent for administering the Medicaid program, that its requests for rate increases were being "held pending resolution of the certification situation ... in accordance with an August 1st, 1980 directive from R.F. Smith to take no action on rate increases for any nursing homes under possible decertification circumstances." Record at 281. Americana then requested and was granted an administrative DPW hearing concerning the agency's refusal to grant a rate increase due to the pending decertification. The hearing officer issued findings of fact, conclusions of law, and recommendations adverse to Americana. Insofar as is pertinent to the issues presented, the hearing officer determined, as fact, the following:

"1. The directive of August 1, 1980, applied to any nursing home subject to decertification, and it deferred action on any rate increase for such home from its receipt of a decertification notice until the conclusion of any hearing held pursuant to such notice.

2. The hearings requested by Petitioners were delayed initially as the result of decertification proceedings instituted by the Department of Health and Human Services, and they have since been prohibited by preliminary injunction issued January 29, 1981, on Petitioner's complaint." Record at 302.

Based upon these findings, the hearing officer concluded, as a matter of law, that the rate freeze directive was not an unpromulgated rule within the meaning of I.C. 4-22-2, because

(a) the directive pertained only to nursing homes in the process of an administrative adjudication and therefore, was part of and subject to the administrative adjudicatory proceeding involving decertification; and

(b) the directive fell within the discretionary powers of the agency, pursuant to I.C. 12-1-2-3(f) to "take such action as may be deemed necessary or desirable to carry out the provisions of this act." Record at 302.

The hearing officer's findings, conclusions, and recommendation were subsequently adopted by the DPW Board,

---

1. The parties present their respective argument within a factual framework of a still pending decertification procedure and in effect concede that Americana's status as a provider continued during the times relevant to our determination.

prompting Americana to seek judicial review.

The reviewing court reversed DPW's decision. It concluded that the rate freeze directive was a rule within the meaning of I.C. 4–22–2–1, and as such was unpromulgated and without effect. It further found that the hearing officer erred in concluding that DPW's refusal to grant a rate increase, as per the directive, was justified as an exercise of discretionary power under I.C. 12–1–2–3(f). The court denied Americana's request for an order of mandate to require DPW to reimburse Americana at a court-established rate, and remanded the matter to DPW directing DPW to

"consider and determine the increase in rates requested by the plaintiffs with all due haste in order to minimize any further damages which may have accrued as a result of the agency's unlawful refusal to consider the request for increase of the rates of Medicaid reimbursement to be paid to the plaintiffs and determine the amounts due and owing plaintiff, if any, by reason of this wrongful refusal to consider the plaintiffs' request for an increase in rates." Record at 166.

## I.

## NATURE OF DPW DIRECTIVE

The principal issue presented for review is whether the directive of the Indiana Department of Public Welfare relating to rate freezes for healthcare providers involved in decertification proceedings is an unpromulgated rule, an administrative adjudication, or an agency decision relating solely to internal policy and procedure. Americana argues that the reviewing court was correct in determining that the directive was an unpromulgated rule and, as such, without effect. DPW maintains that the directive is either an integral part of an administrative adjudication, or an internal policy or procedural decision within the discretionary authority of the agency.

Section 3 of the Administrative Rulemaking Act, I.C. 4–22–2–3 (Burns Code Ed., 1984 Supp.) defines "rule" as follows:

"(b) 'Rule' means any rule, regulation, standard, classification, procedure, or requirement of any agency, designed to have or having the effect of law or interpreting, supplementing, or implementing any statute. The term includes any matter incorporated by reference in compliance with section 7.1 [4–22–2–7.1] of this chapter, but does not include resolutions or directions of any agency relating solely to internal policy, internal agency organization, or internal procedure which do not have the force of law and does not include 'administrative adjudication.' "

An administrative adjudication is defined in the same section as "the administrative investigation, hearing, and determination by any agency of issues or cases applicable to particular parties."

■ At the outset we may eliminate DPW's contention that the directive must be considered an administrative adjudication because it relates to healthcare providers who are involved in adjudicatory proceedings. The directive does not fall within the definition of "administrative adjudication" because it was not shown to have been preceded by an investigation and hearing, nor was it a determination of an issue applicable to a particular party. Rather, the rate freeze directive pre-dated Americana's notice of decertification and applied equally to all healthcare providers who were similarly situated. Although DPW implies otherwise, the proceedings involving decertification of the Americana facilities were entirely separate and distinct from the requested rate reimbursement increase and the hearing thereon. The fact that the two proceedings were related does not draw the rate freeze directive within the meaning of an adjudication.

Far more viable is DPW's characterization of the freeze directive as an internal policy decision to defer agency action on requested rate increases until such time as the decertification proceedings were concluded. As stated in the statute, resolutions or directives relating *solely* to internal agency policy or procedure are excluded from the definition of a "rule", and

therefore need not be promulgated in compliance with the rulemaking provisions.

For reasons which follow, we hold that the rate freeze directive is in the nature of a rule, and because it was not promulgated in compliance with statutory requirements, it is void and without effect.

■ The rulemaking function is distinguished from the adjudicatory function in that the former embraces an element of generality, operating upon a class of individuals or situations whereas an adjudication operates upon a particular individual or circumstance. In addition, the exercise of administrative rulemaking power looks to the future, whereas an adjudication operates retrospectively upon events which occurred in the past. *Beacon National Life Insurance Co. v. Texas State Board of Insurance* (1979) Tex.Civ.App., 582 S.W.2d 616; *Strumsky v. San Diego Employees Retirement Association* (1974) 11 Cal.3d 28, 112 Cal.Rptr. 805, 520 P.2d 29.

■ The rate freeze directive possesses qualities which are typical of administrative rules because it is an agency statement of general applicability to a class—i.e., all certified healthcare providers in the State of Indiana who seek increased Medicaid reimbursement rates during the pendency of an administrative decertification proceeding. In addition, the directive is and was applied prospectively, as of August 1, 1980, to all healthcare providers similarly situated. The directive has been applied as though it had the effect of law, and it affects substantive rights of certified Medicaid providers in that it denies, for an indefinite period, the rate increases to which a provider may be otherwise entitled. For these reasons, we conclude that the directive which freezes the Medicaid reimbursement rates of certified providers until the termination of decertification proceedings constitutes a rule; the rule having not been duly promulgated in accordance with the provisions of I.C. 4–22–2–2, is void and

without effect. *Mugg v. Stanton* (1st Dist. 1983) Ind.App., 454 N.E.2d 867.

■ Furthermore, we do not agree with DPW that the directive relates *solely* to internal policies and procedures. The impact of the directive falls outside the agency upon a class of healthcare providers to deny rate increases to which the providers may otherwise be entitled. The internal impact of the directive, upon the agency, is of less significance. It merely permits the agency to postpone the consideration of a requested rate increase, until such time as the agency has made a final determination regarding decertification which, as the instant case demonstrates, may be delayed for months. During this time, a provider who is otherwise entitled, must labor under increasing costs without an increase in the reimbursement rate. For these reasons, the directive may not be considered an internal policy which is exempt from the rulemaking requirements.

## II.

■ DPW maintains that it had no authority to grant rate increases to Americana, given Americana's pending decertification,[2] by virtue of two provisions found in the Code of Federal Regulations, 42 CFR 442.12(a) and 42 CFR 441.11(b) as follows:

*42 CFR 442.12:*

"(a) ... a Medicaid agency may not ... make Medicaid payments to a facility for those services unless the Secretary or the State survey agency has certified the facility under this part to provide those services."

*42 CFR 441.11:*

"(a) If a Medicaid agency terminates or fails to renew a provider agreement for the services specified in paragraph (c) of this section because the services no longer meet the applicable definitions, FFP [Federal Financial Participation] may be continued for a period specified in para-

---

**2.** DPW states "the question is whether DPW's failure to make a final determination in the decertification proceeding precludes its power to deny a rate increase." (Appellant's Brief at

19) DPW therefore concedes that at all times relevant Americana's status as a provider had not been terminated either by "decertification" or otherwise.

graph (b) of this section, only—(1) for payment for individuals admitted to the facility before the provider agreement terminated or was not renewed; and (2) if the agency makes reasonable efforts to transfer the individuals to another facility or to alternate care.

(b) FFP may be continued under the conditions specified in paragraph (a) of this section for no more than thirty days from—(1) the termination or expiration date by HCFA (a sub-division of the federal Department of Health and Human Services) of the facility's provider agreement under Medicare; (2) the termination or expiration date by the agency of its provider agreement ...".

The above provisions, as pertinent here, specify that a Medicaid agency may not execute a provider agreement nor make Medicaid payments unless the healthcare facility has been certified by the appropriate state agency, and that if the Medicaid agency terminates the healthcare facility's provider agreement because the services no longer meet certain standards, then payments may be continued for no more than thirty days from the date of termination.

DPW's argument, in reliance upon the CFR provisions, is somewhat nebulous, but seems to be that had it not been for the preliminary injunction precluding termination of Americana's Medicaid status, then Americana would have been decertified, its provider agreements terminated, and DPW would have been without authority to continue to reimburse Americana for the care of its Medicaid patients beyond thirty days from the date of termination. Therefore, DPW argues, because the Seventh Circuit vacated the preliminary injunction, the situation should be viewed as though an injunction had never issued, and as though Americana's provider agreements had been terminated, which termination would have occurred had it not been for the injunction. Thus, DPW would have been without authority to continue Medicaid payments and of course without authority to grant a rate increase for such Medicaid payments.

This argument is without merit. The CFR provisions to which DPW refers do not apply to *certified* healthcare facilities such as Americana. It is most apparent that § 442.12 applies to uncertified facilities seeking certification, and § 441.11 applies to facilities whose provider agreements have been terminated or not renewed. Americana fits none of those categories. Thus, the provisions have no relevance.

Furthermore, DPW urges that we should make our determination based upon a hypothetical situation, i.e., the decertification of Americana had there been no injunction. We will not do so. The record before this court discloses that Americana was a certified Medicaid provider at the time it sought rate increases, and there is no evidence of record which reveals that Americana has subsequently been decertified. Therefore, we view Américana as a certified Medicaid provider, which may have been entitled to a rate increase, which increase was improperly denied by virtue of DPW's adherence to an unpromulgated rule.

### III.

### WHETHER THE RATE FREEZE DIRECTIVE IS WITHIN DPW'S DISCRETIONARY POWER

DPW next argues that the rate freeze directive was issued pursuant to the discretionary power conferred by I.C. 12–1–2–3(f), which provides:

"IDPW may make such rules and regulations and take such action as may be deemed necessary or desirable to carry out the provisions of this act and which are not inconsistent therewith."

Our resolution of Issue I is determinative of this issue. Having determined that the rate freeze directive constitutes an unpromulgated rule, and noting that an agency has no power, discretionary or otherwise, to issue rules or regulations except as provided by statute, *Indiana Air Pollution Control Board v. City of Richmond* (1983) Ind., 457 N.E.2d 204, we must conclude

that the rate freeze directive is not validated as within DPW's discretionary power.

## IV.

### WHETHER THE TRIAL COURT IMPROPERLY ISSUED A WRIT OF MANDATE

■ DPW contends that the reviewing court, pursuant to Americana's request, improperly issued a Writ of Mandate because Americana did not comply with the statutory requirements for filing a Petition for a Writ of Mandate.

The portion of the judgment which DPW characterizes as a Writ of Mandate is as follows:

> However, the court does *mandate* DPW to consider and determine the increase in rates requested by the plaintiffs with all due haste in order to minimize any further damages which may have accrued as a result of the agency's unlawful refusal to consider the request for increase of the rates of Medicaid reimbursement to be paid to the plaintiffs and determine the amounts due and owing plaintiff, if any, by reason of this wrongful refusal to consider plaintiffs' request for an increase in rates. (Emphasis supplied)

Americana argues that the use of the word "mandate" does not transform the judgment into a Writ of Mandate. Americana urges that the language of the judgment is nothing more than an instruction to DPW, requiring it, on remand, to expeditiously consider Americana's request for rate increases.

We agree with Americana that the use of the word "mandate" does not elevate the judgment to the status of a Writ of Mandate. Rather, it appears, from the use of the term, that the purpose was to admonish DPW not to delay the proceedings any further. This conclusion is bolstered by the fact that Americana did formally petition the reviewing court for a Writ of Mandate to require DPW to reimburse Americana at a rate established by the court, which the court denied. In this light we consider the word "mandate" to have been used in an informal sense.

## V.

### COST OF TRANSCRIPT OF ADMINISTRATIVE RECORD

■ Americana was granted an order compelling DPW to reimburse it for the cost of obtaining the record of the administrative proceedings filed with the reviewing court. DPW argues that the court erred in ordering it to reimburse Americana for these costs. It urges that the provisions of I.C. 4-22-1-14 reflect a legislative intent that "any party seeking the benefit of a transcript is to pay for it." Appellant's Brief at 25.

Americana maintains that a party seeking judicial review of agency action need pay only for the cost of a *copy* of the administrative transcript, as provided in I.C. 4-22-1-9. It argues that the plain meaning of the statute is to place the cost of the original administrative record upon the agency. Americana contends that because it filed the original administrative transcript with the reviewing court and not a copy, the cost of the transcript must be borne by DPW.

The statutory provisions upon which the parties rely, sections 9 and 14 of the Administrative Adjudication Act, are as follows:

> "Section 9. Record of hearing—Official reporter, employment and compensation—Transcript of pleadings and evidence.—The transcript of testimony adduced and exhibits admitted together with the notice, all pleadings, exceptions, motions, requests and papers filed, other than briefs or arguments of law, shall constitute the complete and exclusive record of such hearing and determination of such agency and it shall be available to all parties for examination. *Any party may obtain a copy thereof at its expense. Such agency is hereby authorized to employ and engage the services of a stenographer or reporter,* either on a full-time or part-time basis as deemed

advisable by such agency *and pay for such services* of such stenographer or reporter from any funds available to such agency or from any funds which may hereafter be appropriated therefor." (Emphasis supplied)

\* \* \* \* \* \*

"Section 14. Judicial review—Courts—Procedure.—Any party or person aggrieved by any order or determination made by any such agency shall be entitled to a judicial review thereof in accordance with the provisions of this act. Such review may be had by filing with the circuit or superior court of the county in which such person resides, or in any county in which such order or determination is to be carried out or enforced, a verified petition setting out such order, decision or determination so made by said agency . . . .

\* \* \* \* \* \*

*Any party or person so filing such verified petition for review with such court shall within fifteen [15] days thereafter secure from such agency a certified copy of the transcript of said proceedings before the agency* including the order or administrative adjudication sought to be reviewed and file the same with the clerk of such court in which such action for review is pending." (Emphasis supplied)

The question was presented to this court recently in *Shettle v. Meeks* (2d Dist.1984) 465 N.E.2d 1136. We held that section 9 of the Administrative Adjudication Act requires that the administrative agency pay for and prepare the complete and exclusive record of the administrative hearing, including the transcript of testimony, exhibits, the notice, pleadings, exceptions, motions, requests, and the papers filed. That record must then be made available to all parties for examination, and any party may purchase a copy of the record.

Section 14, which provides for judicial review, states that the aggrieved party may secure from the agency a *certified copy* of the transcript of the administrative

hearing and file said *copy* with the clerk of the court where the petition for review was filed. Thus, in *Meeks* this court concluded that section 14 required the petitioner to file a certified *copy* of the administrative transcript to obtain judicial review. At 1142. "These requirements flow together logically so that the agency must prepare the transcript and a petitioning party must purchase a copy thereof for filing with the reviewing court. This also permits the agency to maintain the original for the party's examination in their offices as required by paragraph one of the Record-Reporter section." *Id.*

As earlier noted, Americana states that it filed the *original* of the administrative record. However, the statute requires an aggrieved party to file and pay for a certified copy of the administrative record. Thus, we will treat the administrative record filed by Americana as though it were a duplicate of the original—or a copy. As such, Americana is required to bear the $105.60 expense occasioned by reproduction of the original record. Thus, we reverse the order of the trial court to the extent that DPW was required to reimburse Americana for the preparation of the record of the administrative proceedings, which was filed in the Marion Superior Court, and remand with instructions directing Americana to pay DPW for the cost of duplicating the record.

In all other respects, the judgment is affirmed.

BUCHANAN, C.J., and SHIELDS, J., concur.