Shelley GORKA, a Minor, b/n/f her Mother, Sauncey Gorka, Lois Hensley, a Minor, b/n/f her Mother, Marilyn Hensley, Coletta Clayton, Anna Skaggs, Columbus Transportation, Inc., Ambulatory Renal Services, Inc., Classic Carriage, Inc., Susan Buchanan, d/b/a Medical Transport, CS Medical Transportation Services, Inc., A.S.A.P. Transportation, Ltd., River Cities Yellow Cab Co., Inc., Mainstream Transportation Authority, Inc., Bassemiers Transportation, Inc., and West Central Indiana Ambulance Service, Inc., Appellants–Plaintiffs,

v.

Cheryl SULLIVAN, in her individual capacity and as Secretary, Indiana Family and Social Services Administration, James M. Verdier, in his individual capacity and as Assistant Secretary, Indiana Office of Medicaid Policy and Planning, Indiana Family and Social Services Administration, and Indiana Office of Medicaid Policy and Planning, Appellees–Defendants.

No. 49A02–9507–CV–385.

Court of Appeals of Indiana.

Aug. 14, 1996.

Transfer Denied Jan. 22, 1997.

Pamela Carter, Attorney General, Beth Henkel, Deputy Attorney General, Indianapolis, for Appellees.

## OPINION

KIRSCH, Judge.

The appellants, a plaintiff group consisting of certain Medicaid recipients, a taxi company and a certified class of common carriers who provide transportation for Medicaid recipients appeal from a summary judgment in favor of the Indiana Family and Social Services Administration (the Medicaid agency). The parties present several issues, which we consolidate and restate as:

I. Whether the federal Social Security Act[1] preempts the Indiana Motor Carrier Act.[2]

II. Whether the Medicaid agency must pay the common carriers' filed rates, rather than the lower Medicaid transportation rates.

III. Whether the Medicaid agency violated the Indiana rulemaking statute in adopting certain transportation rates.

IV. Whether the Medicaid agency's transportation rates violate the just compensation provisions of the Indiana Constitution.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Indiana provides health care for low-income patients through the Medicaid program. Part of the program funding comes from the federal treasury, and federal officials oversee the program jointly with the Indiana Medicaid agency. To receive the federal funding, Indiana must comply with the federal Medicaid regulations. *See* Social Security Act, Title XIX, §§ 1901–1917, 42 U.S.C. §§ 1396—1396u (1995). Those regulations require Indiana to assure that Medicaid patients have transportation to and from health care providers' offices. 42 C.F.R. § 431.53 (1995). Indiana fulfills this require-

Thomas R. Ruge, Todd A. Richardson, Richard T. Trettin, Lewis & Kappes, P.C., David F. McNamar, Randall R. Fearnow, McNamar, Fearnow & McSharar, P.C., Indianapolis, for Appellants.

1. Social Security Act, Title XIX, §§ 1901–1917, 42 U.S.C. §§ 1396—1396u (1995).

2. IC 8–2.1–22–1 to –46.

ment by contracting with transportation businesses to serve Medicaid patients.

In 1992, the cost of the requisite transportation services rivaled the cost of physician services: $399 per patient for transportation versus $461 per patient for physician services. *Record* at 683, 685, 762. The cost included wheelchair accessible services, termed "nonambulatory services" and known by the acronym NAS, as well as transportation for patients able to walk, termed "commercial ambulatory services" or CAS. Indiana's transportation costs concerned federal Medicaid officials, and in 1992–93 federal officials audited Indiana's program with the stated objective of determining "methods for controlling future CAS transportation costs." *Record* at 619. The officials estimated that in 1990, Indiana's CAS cost was nearly sixteen million dollars. In the audit report, the federal officials offered three suggestions for reducing CAS costs: pay lower rates to transportation providers, pursue less expensive transportation alternatives, and eliminate unjustified transportation claims. *Record* at 621. The federal officials estimated that these cost-saving measures could reduce Indiana's annual CAS expense by about six million dollars. *Record* at 621.

In March 1993, the Medicaid agency issued bulletins announcing new, lower rates it would pay to transportation providers. *Record* at 817. Formerly, the maximum rate for CAS providers (other than taxis) was $15, plus $2.00 per mile for out-of-county mileage. *Record* at 818. The new CAS maximum rate would be $10, plus $1.25 per mile after ten miles, regardless of whether the trip involved out-of-county miles. The NAS rate was formerly $30 plus $2.00 per mile for out-of-county mileage; the new rate would be $20 plus $1.25 per mile. *Record* at 818.

A group of Medicaid transportation providers (the Providers) and patients filed a complaint against the Medicaid agency in Marion Superior Court, challenging the new rates and seeking an injunction, a writ of mandamus and a declaratory judgment. The Providers alleged the new rates violated Indiana and federal law and sought damages for payments withheld or denied by the Medicaid agency. The agency removed the action to the United States District Court for the Southern District of Indiana. Both sides filed summary judgment motions in federal court. The federal court granted judgment in favor of the Medicaid agency on the federal law claims and remanded the case to state court for resolution of the state law claims. The Providers appealed the summary judgment, and the federal appellate court vacated the district court's decision for lack of jurisdiction. *Gorka v. Sullivan*, 82 F.3d 772 (7th Cir.1996).

After remand (but before the federal appellate decision), the Providers sought class certification in state court pursuant to Ind. Trial Rule 23. The court certified a class consisting of all CAS and NAS Providers who were certified as common carriers in Indiana. Both sides again sought summary judgment, and the trial court granted judgment in favor of the Medicaid agency. We will add additional facts as necessary.

## DISCUSSION AND DECISION

### I. Standard of Review

In an appeal from a summary judgment, this court applies the standard prescribed in Ind.Trial Rule 56, as does the trial court. *Selleck v. Westfield Ins. Co.*, 617 N.E.2d 968, 970 (Ind.Ct.App.1993), *trans. denied.* Summary judgment is appropriate when there are no material factual issues related to the summary judgment motion. Ind.Trial Rule 56(C); *Indiana Dep't of Pub. Welfare v. Murphy*, 608 N.E.2d 1000, 1002 (Ind.Ct.App.1993). In this appeal, the parties' legal arguments are interspersed with factual allegations, but the allegations are not material to the summary judgment. Rather, each party claims the undisputed facts support summary judgment in their favor. Accordingly, we review only the legal basis for the trial court's decision. *State ex rel. Bd. of Dental Examiners v. Judd*, 554 N.E.2d 829, 830 (Ind.Ct.App.1990).

### II. Preemption

The Providers contend the Indiana Motor Carrier Act gives the Indiana Department of Revenue exclusive jurisdiction over common carrier rates. As such, the Providers argue,

the Medicaid agency must pay the rates authorized by the Department of Revenue, rather than the new, lower rates established by the Medicaid agency. In response, the Medicaid agency argues that the federal Medicaid Act preempts the Indiana Motor Carrier Act, thereby allowing the Medicaid agency to adopt rates different from the common carrier rates.

The Motor Carrier Act requires that businesses desiring to provide passenger transportation to the general public be certified as common carriers. IC 8–2.1–22–11. To be certified, a transportation business must demonstrate that the proposed transportation operation is required for "public convenience and necessity." IC 8–2.1–22–13. Once the carrier is certified, the Indiana Department of Revenue regulates the transportation operation, including schedules and fares. IC 8–2.1–22–3. The carrier must file its proposed fares with the Department. IC 8–2.1–22–23(a). These fares are known as the "filed rates."

The Department of Revenue must determine whether the filed rates are "just and reasonable." IC 8–2.1–22–21. To make that determination, the Department applies the statutory ratesetting standard, giving consideration to, among other things, the public need for "adequate and efficient transportation ... at the lowest cost consistent with the furnishing of service" and "the need of revenues sufficient to enable such carriers under honest, economical, and efficient management to provide service." IC 8–2.1–22–21(a)(3)–(4). Once the filed rate is in place, the carrier must charge that rate, nothing higher or lower. IC 8–2.1–22–23(c).

■ The Medicaid agency contends the ratesetting standard in the Indiana Motor Carrier Act conflicts with the standard in the federal Medicaid Act. As such, the agency argues, the federal statute preempts the

Indiana Act. The agency also contends that the federal Medicaid statute requires a single state agency to control Medicaid reimbursement rates. The Providers challenge both contentions. The trial court found that the federal Medicaid statute preempts the Indiana Motor Carrier Act. We disagree.

■ In this case, preemption turns on whether Congress intended that federal regulation supersede state law. *Louisiana Pub. Service Comm'n v. F.C.C.*, 476 U.S. 355, 369, 106 S.Ct. 1890, 1899, 90 L.Ed.2d 369 (1986). State law that conflicts with federal law has no effect, because the conflict is in derogation of Congress' intent that federal law control the subject at issue. U.S. Const. art. VI, cl. 2; *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128–29, 68 L.Ed.2d 576 (1981). To determine whether the federal Medicaid Act preempts the Indiana Motor Carrier Act, we examine whether the ratesetting standards in the respective acts impose conflicting requirements.

The federal standard, known as the "equal access" standard, requires states:

"to safeguard against unnecessary utilization of ... care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area."

42 U.S.C. § 1396a(a)(30)(A)(1990).[3] Similarly, the ratesetting standard in the Indiana Motor Carrier Act authorizes the state Department of Revenue to prescribe "just and reasonable" rates, considering, among other things, the public need for adequate and efficient transportation service "at the lowest cost consistent with the furnishing of service." IC 8–2.1–22–21(a)(3). Further, the Department must determine that:

---

**3.** The Medicaid agency cites the federal ratesetting standard contained in the Boren Amendment to the Medicaid Act, 42 U.S.C. § 1396a(a)(13)(A)(1995). In addition, the Medicaid agency relies on this court's decision applying the Boren Amendment in *Indiana Dep't of Pub. Welfare v. Lifelines of Indianapolis Ltd. Partnership*, 637 N.E.2d 1349 (Ind.Ct.App.1994) *trans. denied.* The Boren Amendment, however,

refers only to hospitals, nursing homes and certain other health care institutions. The Medicaid agency cites no authority indicating that the Boren Amendment applies to the Providers in this case. Accordingly, we do not consider whether the ratesetting standard in the Boren Amendment conflicts with the Indiana Motor Carrier Act.

"the revenue is sufficient to cover the cost (including all operating expenses, depreciation accruals, rents and taxes of every kind) of providing adequate transportation service and reasonable profit to the carrier. The relation of carrier expenses to carrier revenues may be considered the proper test of a reasonable profit."

IC 8–2.1–22–21(b).

There is nothing inherently inconsistent between these two standards. Both require that service providers be efficient and that providers' rates be sufficient to respond to the demand for the services. The Medicaid agency argues that the state Motor Carrier Act conflicts with the federal act because the state ratesetting standard requires revenues to cover all operating expenses.[4] The Motor Carrier Act, however, does not mandate that all expenses, however unreasonable, be covered by revenues. The Act indicates that revenues should be sufficient to enable carriers under "honest, economical and efficient management" to provide transportation service. IC 8–2.1–22–21(a)(4). Likewise, the federal standard indicates that rates should be consistent with "efficiency, economy and quality of care." 42 U.S.C. § 1396a(a)(30)(A)(1990). Efficiency and economy are benchmarks in both standards. Accordingly, a specific transportation rate could fulfill both the federal Medicaid standard and the Indiana Motor Carrier standard.[5] The language differences between the standards do not rise to the level of a conflict for preemption purposes. Absent a conflict, there is no basis for preemption of the Indiana standard.

The Medicaid agency 's second preemption argument is based on the premise that the federal Medicaid Act requires rates to be set by a single state agency. The premise is flawed; the federal Medicaid Act does *not* require a single state agency to set all reimbursement rates. To the contrary, the federal Medicaid regulations allow the state Medicaid agency to delegate authority. 42 C.F.R. 431.10 (1995); *King v. Sullivan*, 776 F.Supp. 645, 656–57 (D.R.I.1991) ("[t]he [Medicaid] statute does not require states to use only one agency to carry out every task that is part of the State [Medicaid] Plan."). Given that the federal statute allows multiple state agencies to participate in the state Medicaid plan, and that the ratesetting standards in the federal statute and the Motor Carrier Act do not conflict, the federal act does not preempt the Motor Carrier Act.

## III. Governmental Control Exemption from the Filed Rates

The Motor Carrier Act exempts certain passenger services from common carrier regulation. For example, ambulances certified by the Indiana Emergency Medical Services Commission are exempt, as are school buses while transporting students under the supervision, control, and direction of school authorities. IC 8–2.1–22–2.1(a)(1), (a)(9). At issue in this case is the "governmental control exemption:"

"This chapter [transportation of passengers] does not apply to the following:

. . . .

(3) Motor vehicles while being used or operated under the control, direction, and supervision of:

(A) the United States government, the state, or a political subdivision; or

(B) the board of trustees of any state institution."

IC 8–2.1–22–2.1(a)(3). The Medicaid agency contends the exemption relieves the Providers from the filed rate provisions of the Motor Carrier Act. The Providers maintain that application of the exemption would defeat the purpose of common carrier certification and that as such the Medicaid agency must pay the common carrier filed rates.

No Indiana court has interpreted the governmental control exemption, but the statute requires little interpretation. If a government agency controls, directs and supervises a carrier's operations, the carrier is exempt from the Motor Carrier Act. Here, once the Providers accept a Medicaid con-

---

4. The cases cited by the Medicaid Agency discuss primarily the Boren Amendment.

5. Measuring a specific rate against either standard would be a complex, fact sensitive inquiry. The issue of whether the present rates fulfill the standards is not before us.

tract, the Medicaid agency has the requisite control, direction and supervision of the Providers' Medicaid operations to trigger the governmental control exemption. At the time the new rates were announced, the Medicaid agency exercised regulatory control over several aspects of the Providers' operations. For example, the agency controlled whether a patient could use a provider for transportation: a patient could use a provider only if transportation was unavailable from another source. Ind. Admin. Code tit. 405, r. 1–6–17(a)(2) (1992) (hereinafter 405 IAC).[6] Further, the Medicaid agency controlled who could be transported and the reason for the transport: the Providers could transport only Medicaid recipients and, in certain instances, the recipient's assistant (405 IAC 1–6–17(f)), and could transport the recipient only to and from Medicaid covered services. 405 IAC 1–6–17(a)(1). Medicaid would pay for the provider's waiting time only in certain circumstances. 405 IAC 1–6–17(d).

In addition to these regulatory controls, the Medicaid agency directed and supervised the Providers' activities through the provider contract. The contract required Providers to, among other things, abide by the Medicaid Program Provider Manual,[7] submit billing in a Medicaid-prescribed manner, cooperate with federal and state personnel in audits, make provider records available, and, significantly, "to accept payment as determined by [the Medicaid agency] or its agent in accordance with federal and state statutes and regulations as payment in full for all covered services provided to Medicaid recipients." *Record* at 1734–35. By signing a provider contract, the Providers have accepted the many contractual and regulatory constraints applicable to the transportation of Medicaid patients. These constraints subject the Providers to the control, direction and supervision of the Medicaid agency when transporting Medicaid patients.[8]

The Providers argue that the governmental control exemption is inapplicable, claiming that section 19(a) of the Motor Carrier Act requires the Medicaid agency to file a complaint with the Department of Revenue in order to alter the filed rates. *See* IC 8–2.1–22–19(a). We disagree. Although section 19(a) allows government agencies to complain to the Department of Revenue if a rate violates the Motor Carrier Act, it does not require agencies to file such a complaint. Similarly, IC 8–2.1–22–8, cited by the Providers in opposition to the governmental control exemption, authorizes cooperation among state agencies but does not require that government entities pay the filed rates.

The Providers argue that by certifying them as common carriers, the Department of Revenue determined that the governmental control exemption was inapplicable. The Record, however, contains no express determination by the Department of Revenue concerning the exemption.[9] Nor is the de-

---

6. After the new rates became effective, the Medicaid agency revised the rules. *See* 405 IAC 1–6–17 (1996). The revised rules contain similar controls over the Providers' activities.

7. The Medicaid Program Provider Manual is "the interpretive document(s) issued by the state department to providers to inform them of their obligations under the Medicaid program to which they must conform to retain their provider status and to receive payment for appropriate services, and to provide them essential information for understanding the Medicaid program as it relates to the services for which they are qualified to provide under the state statutes." 405 IAC 1–1–1(h).

8. The Providers claim that an entity is subject to governmental control only to the extent that *all* of the operations are in the shadow of state regulation, citing *Haggard v. PSI Energy, Inc.*, 575 N.E.2d 687 (Ind.Ct.App.1991) *trans. dis-* *missed.* In *Haggard*, the court held that with regard to liability under 42 U.S.C. § 1983, a public utility is not a state entity merely because the utility filed tariffs with the state. *Id.* at 690. Here, however, the Providers have done more than file rates with the state. They have accepted state contracts controlling their Medicaid operations.

9. Several of the Providers' common carrier applications informed the Department of Revenue that the Providers would be operating pursuant to contracts with the Medicaid agency. *See, e.g., Record* at 966–68. The Department certified the carriers without mentioning the governmental control exemption. Nothing in the Record, however, indicates that any party raised the governmental control issue with the Department of Revenue.

termination implicit in the common carrier certifications, for such a determination would imply that a transportation provider must be solely a common carrier or solely under government control. The statutory language contradicts that implication: the governmental control exemption covers motor vehicles *"while being used or operated"* under state direction. IC 8–2.1–22–2.1(a)(3). The exemption applies only while the vehicle is operating according to the control, direction and supervision of the Medicaid agency. At all other times, the carrier is subject to the common carrier provisions.

The Providers also contend that application of the governmental control exemption in this case would strip the Department of Revenue of all common carrier jurisdiction, arguing that "[a]ny assertion of Department authority over a common carrier would mean that the carrier was 'under the control, direction, and supervision' of the government, and therefore exempt from Department regulation." *Appellee's Brief* at 34. This argument misperceives the facts that trigger the exemption. It is not the state authority over common carriers that triggers the governmental control exemption, it is the Medicaid provider contract and the accompanying Medicaid regulations. The contract and the regulations define the relationship between the Providers and the Medicaid agency.

Pointing out that the Department of Revenue has determined their filed rates are reasonable, the Providers argue the same rates are therefore reasonable for transporting Medicaid patients. This argument ignores the potential differences between Medicaid transportation service and transportation provided to the general public, including the possibility of a discounted rate for Medicaid volume business. The governmental control exemption provides the Medicaid agency with the opportunity to contract for government rates, thereby allowing rates to be set according to demand for services and the supply of carriers.[10] The carriers and the agency determine the reasonableness of the rates through the contract process.

In addition to allowing negotiations for government rates, the exemption prevents common carriers from inappropriately binding state agencies to filed rates. In this case, the Record reveals that at least three of the Providers used the filed rate process inappropriately: the providers became aware of the former Medicaid rates, then adopted those rates as their filed rates. *Record* at 622. Later, when the Medicaid agency reduced the rates, the providers sought to use the filed rate doctrine to bind the agency to the former rates. The governmental control exemption prevents those providers from manipulating the filed rate doctrine as a shield against reasonable, periodic rate revisions by the Medicaid agency.

The Providers insist the Medicaid agency's position is untenable, pointing out the apparent inconsistency between the agency's requirement that transportation providers be certified common carriers and the agency's claim that providers are exempt from the common carrier provisions. Reference to the Medicaid agency's purpose in requiring common carrier certification resolves the inconsistency. The primary purpose of the certification requirement appears to be to assure that Medicaid providers are in the business of providing transportation to the general public, not solely to Medicaid patients. The Medicaid regulations confirm this purpose: a transportation provider must be "a distinct transportation business entity which makes transportation services available to the general public." 405 IAC 1–6–18(a).

The Providers also contend that application of the exemption allows the Medicaid agency to obtain the benefits of common carrier certification without paying for those benefits. This argument may ultimately have merit, but it is premature as framed in the Providers' complaint. If certified common carriers cannot or will not provide the necessary transportation services at the rates offered by the Medicaid agency, the agency may need to revise its rates or change its certification requirement. At present, however, the governmental control

---

**10.** The federal Interstate Commerce Act has an analogous provision, allowing rail carriers to provide government transportation without charge or at a reduced rate. 49 U.S.C. § 10721(1985).

exemption allows the Medicaid agency to attempt to obtain sufficient services at rates lower than the filed rates.

## IV. Rulemaking Procedure and Rule Content

The Providers raise two administrative law challenges to the new rates: (1) the new rates are "rules" that must be promulgated in accordance with the Indiana rulemaking statute; and (2) the existing rules fail to specify the method for calculating the amount of reimbursement for transportation services. The Medicaid agency maintains it has fulfilled the rulemaking statute by promulgating rules containing the method for calculating reimbursement. The agency argues that the rates themselves are not rules and need not be promulgated in accordance with formal rulemaking procedures, pointing out that many of their reimbursement rules include only the method for determining rates, not the actual rates. Further, the Medicaid agency argues that the Indiana Supreme Court upheld Medicaid reimbursement rules that did not include rates in *Indiana State Bd. of Pub. Welfare v. Tioga Pines Living Center, Inc.,* 622 N.E.2d 935, 939 (Ind.1993), *cert. denied* 510 U.S. 1195, 114 S.Ct. 1302, 127 L.Ed.2d 654.

### A. Rulemaking Procedure

■ Indiana law requires government agencies to follow formal notice and comment procedures before implementing rules designed to have the effect of law. IC 4–22–2–3, –23 to –36.[11] If the Medicaid payment rates were deemed "rules" within the meaning of the Indiana rulemaking statute, the Medicaid agency would have to comply with notice and comment provisions each time it adjusted rates in response to fiscal or market forces. In apparent recognition of the need for greater rate flexibility, the Indiana legislature indicated that rates are not "rules" within the meaning of the rulemaking statute. Two provisions demonstrate the legislature's decision: first, IC 12–15–21–3(2) requires the Medicaid agency to adopt rules

"specifying the *method* of determining the amount of reimbursement for services" (emphasis added); second, IC 12–8–1–7 authorizes the Secretary of Family and Social Services, through the Medicaid agency (among others), to take actions necessary to implement plans, policies and procedures. IC 12–8–1–7(6), (9). These statutory provisions allow the Medicaid agency to issue rates in bulletins rather than by rule.[12] Nothing in the Indiana rulemaking statute requires the agency to include actual rates or dollar amounts in its reimbursement rules.

Relying on *Blinzinger v. Americana Healthcare Corp.,* 466 N.E.2d 1371 (Ind.Ct. App.1984), the Providers maintain that the new rates are rules, and as such are invalid because the Medicaid agency issued the rates in bulletins rather than using formal notice and comment procedures. In *Blinzinger,* the plaintiff successfully challenged a directive instructing Medicaid rate reviewers to take no action on rate requests from facilities facing decertification proceedings. This court determined that the directive was a rule, and was thus invalid for failure to comply with formal rulemaking procedures. 466 N.E.2d at 1375. The Providers contend the new rates are analogous to the directive at issue in *Blinzinger.* In *Blinzinger,* however, the directive altered providers' eligibility for rate increases. Here, in contrast, the rate bulletins contain no changes affecting the Providers' eligibility for reimbursement.

### B. Rule Content

■ The Providers argue that the promulgated rules fail to recite the method for determining reimbursement, in contravention of the statutory requirement. *See* IC 12–15–21–3. They point to the testimony of Indiana's Assistant Secretary for Medicaid, in which the Assistant Secretary acknowledged that the rules do not provide a specific rate. *Record* at 541. The Assistant Secretary explained that the Medicaid agency periodically issues provider bulletins describing the rates and that the specific rate applicable

---

11. The rulemaking statute and the Indiana Medicaid code both provide for emergency rules without notice and comment, but the emergency provisions are not directed toward rates. *See* IC 4–22–2–37.1, 12–8–1–12.

12. The agency incorrectly labeled the new rates as "regulations" in the bulletin announcing the new rates. *See Record* at 817.

at a certain time can be calculated from the bulletins and the rules. *Record* at 541–42.

The Assistant Secretary's testimony does not indicate that the rules are deficient as a matter of law. The controlling statute requires that the rules specify the method of determining the amount of reimbursement. IC 12–15–21–3. Here, the rules in effect at the time the new rates became applicable satisfied that requirement. The rules stated that Providers would be reimbursed at a base rate, with additional reimbursement for mileage exceeding the specified base. 405 IAC 1–6–17(f), (g)(1994 Supp.).(*See* 16 Ind. Reg.1945 (Mar. 26, 1993)). The Providers would also be reimbursed for some waiting time. 405 IAC 1–6–17(f)(3)(1994 Supp.). Reimbursement for additional passengers would be at one-half the base rate. 405 IAC 1–6–17(h)(1994 Supp.).[13] The rules thus presented a formula for determining the amount of reimbursement: base rate plus mileage and waiting time. To find the rates applicable to the formula, the Providers could refer to the periodic rate bulletins. The formula in the rule specified the method for determining reimbursement, and the rate bulletins provided the numbers to insert into the formula. By providing a formula for calculating rates, the rule specifies the method for determining the amount of reimbursement, fulfilling the statutory mandate.

## V. Constitutionality of the Rate Provisions

The Providers contend the new rates violate two clauses of the Indiana Constitution. First, they argue the State has demanded their services without just compensation, by requiring them to transport Medicaid patients at below-cost rates. Second, the Providers argue the new rates constitute a confiscatory taking of property by the State. The Medicaid agency responds that the constitutional provisions are not at issue, because the Providers are under no compulsion

to accept the new rates or to transport Medicaid patients.

■ Both constitutional issues turn on Section 21 of the Indiana Bill of Rights: "No person's particular services shall be demanded, without just compensation. No person's property shall be taken by law, without just compensation; nor, except in the case of the State, without such compensation first assessed and tendered."

Ind. Const. art. I, § 21.[14]

### A. State Demand for Services

■ The parties agree that to prevail on the services claim, the Providers must meet the test described in *Bayh v. Sonnenburg*, 573 N.E.2d 398 (Ind.1991) *cert. denied* 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 415. The *Sonnenburg* test requires the Providers to show that they (1) performed particular services, (2) on the State's demand, (3) without just compensation. *Id.* at 411. We need not address whether transportation services are "particular" or whether the Providers have received "just compensation," because we find that the Medicaid agency has not "demanded" the Providers' transportation services within the meaning expressed in *Sonnenburg*.

The plaintiffs in *Sonnenburg* sought payment under the just compensation provision for work they did while they were patients in state mental hospitals. Analyzing the patients' claim, our supreme court determined that the state had demanded their services because the patients reasonably believed they would be punished if they refused to work. The court explained the essence of a demand, as opposed to a request, for services: "the use or threatened use of physical force or legal process which creates in the citizen a reasonable belief that he is not free to refuse the request." *Id.* at 417 (citing *United States v. Kozminski*, 487 U.S. 931, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988)).

*Bayh v. Sonnenburg*, 573 N.E.2d 398, 402 (Ind. 1991). We must address the constitutional issues here, because we have determined that the Providers' other theories do not warrant reversal. We address only the portions of the issues necessary for resolution of the appeal.

---

**13.** Subsequent regulations maintained the basic method of base rate plus mileage and certain waiting time. 405 IAC 1–6–17(f),(g)(1996).

**14.** We recognize that a reviewing court should not address constitutional issues if there are other potentially dispositive issues in the case. *See*

Here, the State has requested the Provider's services by offering a contract to transport Medicaid patients. The Providers are free to reject the offer, or to cancel their existing contracts. The freedom to reject the offer or cancel the contract establishes that the State has not demanded the Providers' services. The Providers contend this conclusion is simplistic, arguing that they cannot freely opt out of the Medicaid program. They claim the non-discrimination provisions in the Motor Carrier Act require them to accept the Medicaid contract, because as common carriers they must transport all persons, including, they argue, Medicaid patients. The provisions cited by the Providers, however, do not require them to accept the Medicaid contract. The provisions state that a common carrier is "guilty of unjust discrimination" if the carrier "fails or refuses to . . . transport without unreasonable delay or discrimination the passengers . . . tendered for transportation." IC 8–2.1–22–18(c). Nothing in these non-discrimination provisions require the Providers to transport passengers, whether Medicaid patients or others, who cannot or will not pay for the transportation service. Rather, the provisions require the Providers to transport all passengers tendered for transportation. Medicaid patients are not tendered for transportation within the meaning of the non-discrimination provisions unless they offer to pay the filed rates for the service. Common carriers may thus choose not to accept the new rates without running afoul of the non-discrimination provisions. If the Providers accept a Medicaid contract, however, they must transport Medicaid patients according to the contract terms.

The Providers contend the Medicaid agency threatened them with legal process under the non-discrimination provisions, and that the threat constituted a demand for services according to the *Sonnenburg* test. In support of this contention they point to a letter the Medicaid Program Operations Director sent to one of the Providers, who had decided not to transport Medicaid patients from apartments or residences. In the letter, the Program Operations Director stated that the Provider's decision appeared to violate the nondiscrimination provisions of the Motor Carrier Act. *Record* at 2023–24. Citing *Sonnenburg,* the Providers contend the letter was sufficiently coercive to instill a reasonable belief that they would face legal process if they refused to transport Medicaid patients from apartments and residences. The *Sonnenburg* decision, however, does not extend to the Providers' circumstances. In *Sonnenburg,* the State controlled nearly every aspect of the plaintiffs' lives, because the plaintiffs resided in state hospitals. 573 N.E.2d at 418. Further, as the court noted, the plaintiffs' mental impairments may have rendered them particularly susceptible to perceived coercion. *Id.* Here, in contrast, the Providers are business owners who manage transportation schedules, vehicles and personnel, and who provide transportation to the general public. The Medicaid agency controls their operations only while they are transporting Medicaid patients. The Providers are thus not subject to the conditions that supported the court's holding in *Sonnenburg.* To the contrary, in response to the allegedly coercive letter, the provider stated "Our attorneys advise us that we have excellent legal grounds upon which to contest this matter should we so desire." *Record* at 2029. Given the Providers' business stature and the readily available option to cancel their Medicaid contracts, the Providers' argument that the State demanded their services fails.

### B. State Confiscation of Property

■ The Providers contend that the new rates should be deemed an unconstitutional taking of property. In support of this contention, they cite *Southern Indiana Ry. Co. v. R.R. Comm'n of Indiana,* 172 Ind. 113, 87 N.E. 966 (1909). In *Southern Indiana,* the court noted that "[r]egulation must stop short of confiscation" and that state-imposed rates which cause a financial loss may violate the just compensation provision of Indiana's constitution. 172 Ind. at 122, 128, 87 N.E. at 966, 969, 971. The Providers also cite other public utility rate cases for the same proposition.

■ The Providers' reliance on public utility rate cases is unavailing. A public utility has a statutory duty to serve the

public. The state has mandated that the utility use private assets in the public interest, so the state has taken the utility's property in the constitutional sense. *See Duquesne Light Co. v. Barasch,* 488 U.S. 299, 307, 109 S.Ct. 609, 615, 102 L.Ed.2d 646 (1989) (interpreting U.S. Constitution). Having taken the property, the State must provide reasonable compensation to the property owner—unreasonably low compensation violates the just compensation provision. *See Smyth v. Ames,* 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898).

Here, however, the Medicaid agency has not taken the Providers' property for a public use. There is a statutory mandate that the Providers serve the general public, but that mandate applies only to their common carrier operations. As discussed above, the Motor Carrier Act does not require the Providers to transport Medicaid patients. The only binding obligations the Providers have regarding Medicaid patients is the provider contract. The contract is not a state mandate, and thus does not constitute a taking. To be a taking in the constitutional sense, the state action at issue must be more than a consequential limitation on the use or enjoyment of property; a taking involves an actual interference with a property right. *Indiana Toll Rd. Comm'n v. Jankovich,* 244 Ind. 574, 582, 193 N.E.2d 237, 240 (1963) *cert. dismissed* (to prevail on a takings claim, a plaintiff must demonstrate that the State has appropriated property for a public use); *Johnson v. Kosciusko County Drainage Bd.,* 594 N.E.2d 798, 804 (Ind.Ct.App.1992) *trans. denied.*

In *Minnesota Ass'n of Health Care v. Minnesota Dep't of Pub. Welfare,* 742 F.2d 442 (8th Cir.1984) *cert. denied* 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337, the plaintiff presented a constitutional challenge similar to the one the Providers assert here. The plaintiff, a nursing home association, challenged a state statute limiting the rates that nursing homes could charge private-pay patients. The plaintiffs claimed the statute violated the just compensation provisions of the U.S. Constitution. Like the Providers here, the plaintiffs relied on public utility precedents. The court reject-

ed the plaintiff's challenge, explaining that "[c]ases concerning public utilities are inapposite ... because the present case simply does not involve a forced taking of property by the state." 742 F.2d at 446. In particular, the court noted that "the state does not require that nursing homes admit medical assistance residents and participate in the Medicaid program." *Id.* The court found that despite the strong financial inducement for nursing homes to accept Medicaid patients, participation in the Medicaid program is nonetheless voluntary. *Id.* Due to the voluntary aspect of Medicaid participation, the court concluded, the statutory rate limit was not an imposed taking, thus the plaintiff had no claim for just compensation. *Id.* Similarly, in *St. Francis Hospital Ctr. v. Heckler,* 714 F.2d 872 (7th Cir. 1983) *cert. denied* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679, the plaintiff hospitals challenged a denial of Medicare reimbursement for certain expenses, and relied on public utility cases. Acknowledging that the just compensation provisions of the U.S. Constitution prevent the government from prescribing confiscatory rates for public utilities, the court determined that the plaintiffs' Medicare challenges did not raise a just compensation issue. The court explained that the plaintiffs were free to refuse Medicare patients, and that as such the public utility confiscation cases were inapposite. *Id.* at 876–77.

These two cases are persuasive as applied to the Providers' claims here. The Providers attempt to distinguish the cases on the ground that as common carriers, unlike nursing homes, they operated under a state mandate to serve all members of the public, including Medicaid patients. As explained in Part V.A. above, however, the statutory obligation to serve the public does not require the Providers to transport Medicaid patients at Medicaid rates. The statute requires only that the Providers serve Medicaid patients who tender the filed rates, like all other members of the public. Absent a tender of the filed rates, it is only the provider contract that requires the Providers to transport Medicaid patients. While compliance with the statute is mandatory, acceptance of the contract is not. Accordingly, because the Providers' acceptance of the Medicaid con-

tract is voluntary, there has been no "taking" of the Providers' property by the Medicaid agency.[15]

## VI. CONCLUSION

We hold that: (1) the federal Medicaid Act does not preempt the filed rate provisions of the Indiana Motor Carrier Act; (2) the governmental control exemption of the Motor Carrier Act exempts the Providers from the filed rate provisions of the Act while the Providers are transporting Medicaid patients pursuant to a Medicaid Provider Agreement; (3) the Medicaid agency need not promulgate transportation reimbursement rates in formal rules; (4) the Medicaid agency has not "demanded" the Providers' services within the meaning of the just compensation provision in the Indiana Constitution; and (5) the Medicaid agency has not "taken" the Providers' property within the meaning of the just compensation provision of the Indiana Constitution. Based on these holdings, we affirm the trial court's summary judgment in favor of the Medicaid agency.

Affirmed.

SULLIVAN and NAJAM, JJ., concur.

---

**15.** The Providers denounce the Medicaid agency, claiming the agency's litigation theories demonstrate an "appalling indifference" to the needs of Medicaid patients. *Appellant's Reply Brief* at 33. The Providers also claim the new rates have caused "severe curtailment and elimination" of services, threatening the lives of Medicaid patients. *Appellant's Reply Brief* at 34. We do not address these contentions because the sufficiency of transportation services is a fact issue not material to the summary judgment in this case. The summary judgment did not include a determination of whether the rates provide sufficient access to transportation; the judgment addressed only whether the rates are void as violative of state statutes or the state constitution.